1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10  JAMES BOOTS FLORES,                    1:11-CV-00190 BAM HC

11                    Petitioner,          ORDER DENYING PETITION FOR WRIT OF
                                           HABEAS CORPUS
12       v.
                                           ORDER DIRECTING CLERK OF COURT TO
13                                         ENTER JUDGMENT
    MICHAEL STAINER, Warden,
14                                         ORDER DECLINING ISSUANCE OF
                      Respondent.          CERTIFICATE OF APPEALABILITY
15  _____/

16
17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254.  The parties have consented to the jurisdiction of the Magistrate

    Judge pursuant to 28 U.S.C. § 636(c).
19

20                                      **BACKGROUND**

21          Petitioner is currently in the custody of the California Department of Corrections and

22  Rehabilitation pursuant to a judgment of the Superior Court of California, County of Fresno,

23  following his conviction by jury trial on June 12, 2008, of corporal injury on a child resulting in a

    traumatic condition (Cal. Penal Code § 273d(a)).  (CT[1] 188, 236.)  On August 6, 2008, Petitioner
24
    was sentenced to serve a determinate term of 8 years in state prison. (CT 236.)
25
            Petitioner timely filed a notice of appeal.  On February 10, 2010, the California Court of
26
    Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned
27

28  _____
            [1]"CT" refers to the Clerk's Transcript on Appeal.

1   decision.  (See Resp't's Mot. Dismiss, Ex. 2.)  Petitioner then filed a petition for review in the

2   California Supreme Court.  (See Resp't's Mot. Dismiss, Ex. 3.) On June 9, 2010, the petition was

3   summarily denied.  (See Resp't's Mot. Dismiss, Ex. 4.)

4          On February 3, 2011, Petitioner filed a federal habeas petition in this Court.  Respondent

5   moved to dismiss the petition as a mixed petition containing exhausted and unexhausted claims

6   on May 19, 2011.  Petitioner objected and moved for a stay.  On August 4, 2011, the Court

7   granted Petitioner's motion for a stay and held the petition in abeyance so Petitioner could return

8   to state court to exhaust his unexhausted claims.  Petitioner then filed a petition for writ of

9   habeas corpus in the California Supreme Court. (See Lodged Doc. No. 3.)  On January 25, 2012,

10  the petition was summarily denied. (See Lodged Doc. No. 4.)

11         Petitioner filed a First Amended Petition in this Court on February 16, 2012.  The petition

12  presents the following grounds for relief: 1) The admission of out-of-court statements by

13  Petitioner's daughters as prior inconsistent statements rendered the trial fundamentally unfair and

14  violated his due process rights; 2) The 9-1-1 call was testimonial in nature and its admission

15  violated the Confrontation Clause of the Sixth Amendment; 3) The admission of the 9-1-1 call as

16  a spontaneous declaration rendered the trial fundamentally unfair in violation of the Constitution;

17  4) Permitting the medical expert to rely on inadmissible hearsay to support his opinion violated

18  the Confrontation Clause; 5) Admission of the 9-1-1 call without a limiting instruction that the

19  evidence was not admitted for the truth of the matter violated Petitioner's constitutional rights; 6)

20  The instruction on flight lessened the state's burden of proof and shifted the burden to Petitioner

21  in violation of his due process rights; and 7) The trial court's refusal to strike a prior conviction

22  arbitrarily deprived Petitioner of a state law right in violation of his due process rights.  The

23  Court then terminated the stay and directed Respondent to file a responsive pleading.  On

24  May 23, 2012, Respondent filed an answer to the petition.  On June 20, 2012, Petitioner filed a

25  traverse.

26

27

28

1

## STATEMENT OF FACTS[2]

2
3

Defendant and his wife, G., have two daughters, eleven-year-old C-1 and nine-year-old C-2. At 10:15 a.m. on April 15, 2007, G. called 911 and said she needed an officer to come to her residence.[FN2] The 911 operator asked what was going on. G. said:

4
5

FN2. As we will discuss in issue II, *post,* defendant objected to the introduction of G.'s statements to the 911 operator as inadmissible testimonial hearsay under *Crawford* and the Sixth Amendment. The court found the statements were not testimonial and admissible for the truth of the matter as spontaneous declarations.

6
7
8
9

"Well I this morning I kept hearing my husband tell my daughter to help him on the internet and every little while he was coming in the room to tell her to help him and he was on the phone with the lady helping him and the next thing I hear is my daughter screaming and I come out and he is beating her and I get him off of her and I just see my daughter bleeding so I took the phone, called 911 and he chased me, he attacked me and then my other little daughter tried to [*sic* ] us and he threw her to the ground ..."

10
11

The 911 operator asked G., "[W]here is he now?" G. replied: "He left." The 911 operator asked if anyone needed an ambulance. G. replied:

12
13

"I don't know I just, my daughter is bleeding from the eye and *we couldn't call you guys because the damn phone was hooked to the internet.*" (italics added.)

14
15
16

The 911 operator asked for the caller's name and telephone number. G. identified herself and said she could not find her cell phone, she found "one of his cell phones," and she did not know the number because she just got a new telephone at her house. The 911 operator asked for defendant's name, age, whether he was drunk or high, if he had any weapons, the description of his clothing and car, and where he might have gone. G. answered the questions and said he did not have any weapons, and she did not know if he was drunk or high. She thought he might be at his aunt's house.

17
18
19

Fresno Police Officer Cardenas responded to the dispatch of a possible domestic disturbance and was advised the suspect left the scene in a vehicle. Officer Cardenas arrived at the residence and spoke to G., who was upset and "visibly shaken." G. "blurted" out that she and defendant were involved in a disturbance that occurred just before Cardenas's arrival.

20
21
22
23

Cardenas interviewed defendant's daughter, C-1, who said she was asleep when defendant woke her up that morning.[FN3] She got out of bed and found defendant in the living room. C-1 said defendant was working on the computer and he was on the telephone with "Donna" from technical assistance. C-1 said she went back to bed when she saw that defendant was on the telephone. Defendant called her back several times to help him on the computer. Defendant told C-1, "why can't you be more like Donna." C-1 said she replied, "I don't want to be like Donna."

24
25

FN3. As we will discuss in issue I, *post,* defendant's daughters testified at trial that they did not remember many of the details of the incident or even speaking to Officer Cardenas. The court overruled defendant's Sixth Amendment and hearsay

26

27
28

[2]The Fifth DCA's summary of the facts in its February 10, 2010, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the Fifth DCA.

objections and admitted their statements to Cardenas for the truth of the matter as prior inconsistent statements.

C-1 told Officer Cardenas that defendant got angry and upset at her, and he started to strike her. C-1 said defendant pulled her hair, forced her onto the couch, and continued to strike her. C-1 said defendant hit her face with his hands and maybe with a shoe.

C-1 said she yelled for help and her mother came out to help her. C-1 said G. pulled defendant away from her. G. had a cordless telephone or cell phone and walked away. C-1 said defendant pushed G., took the telephone from her, and told G. not to call the police. C-1 said she went into the bathroom and stayed there until she heard defendant go out the front door.

Officer Cardenas testified he also interviewed defendant's younger daughter, C-2, who said she was asleep in her bedroom and heard G. yelling "leave her alone or stop." C-2 said she went into the living room, and C-1 was sitting on the couch and G. was walking away from defendant. Defendant followed G. and pushed her. C-2 said she did not want her parents fighting so she got in between them. Defendant pushed C-2 and she landed in a laundry basket. C-2 said defendant took the cordless phone from G., and he said, "don't call the police or else I'll go to jail for a long time." C-2 said defendant walked out the front door, said "I'm not coming back," and left.

Officer Cardenas observed injuries to C-1's face and right eye, which were consistent with her description of being hit across the face. Another officer took photographs of C-1's injuries, which consisted of bruises on her right eye, scratches on her forehead, a few scratches on her right cheek, and red marks and a scratch on the right side of her back. Cardenas testified C-2 did not have any physical injuries, but she displayed "emotional distress" as she described what happened between her parents.

Officer Cardenas testified he did not speak to defendant that day because he had left the scene. A dispatch was sent out for defendant and his vehicle, and that he was wanted for child abuse and intimidating a witness.

*C-1's trial testimony*

Defendant was charged with count I, corporal injury to a child (§ 237d, subd. (a)) as to C-1, and count II, dissuading a witness from reporting a crime as to G. (§ 136.1, subd. (b)(1)). At trial, C-1 was called as a prosecution witness, and the prosecutor began the direct examination by asking about her school and the names of her friends. C-1 testified that she was too embarrassed to answer any questions.

In response to the prosecutor's questions, C-1 testified she did not remember when she was hurt and the police came to her house.[FN4] However, she remembered that she fell and hit her head on the floor, her right eye was hurt and red, and that her mom and dad were in the house when it happened. C-1 testified that when she fell down, she was by the corner of the couch and her dad was next to the couch. The prosecutor asked C-1 where she was hurt. C-1 pointed to the inside of her right eye, next to the tear duct, and testified she was not hurt anywhere else.

FN4. Prior to trial, G. requested the court appoint an attorney to represent her children to determine if they had Fifth Amendment privileges. The court appointed counsel for the children, and the prosecutor subsequently granted use immunity to C-1.

"Q Okay. If I was to show you a picture, would that help you?

4

1    "A No.

2    "Q Do you not want to see the picture?

3    "A I don't want to see the picture."

4    The prosecutor asked C-1 to explain what happened the morning that she fell
down. C-1 testified that defendant asked for computer help two or three times, and she
5    gave him the computer password. C-1 testified defendant was on the telephone at the
same time he asked for help, and he said that he was talking to "Donna" from technical
6    support. C-1 testified that her dad asked her to talk to Donna, but she did not do so.

7    "Q And then what happened?

8    "A Like he got mad.

9    "Q Did he get mad at Donna or at you?

10   "A Me.

11   "Q And then what happened?

12   "A Then like I ran, and I fell on the step."

13   C-1 testified she fell and hit her eye on the corner of the step, and she cried and
went into the bathroom. She did not hear any yelling. C-1 testified she stayed in the
14   bathroom until she heard the front door shut. "When I heard the door shut, I came out."

15   "Q And why did you wait until the front door shut before you came out?

16   "A Because I thought they left.

17   "Q Who is they?

18   "A My mom and dad.

19   "Q Okay. And why did you want to wait for your mom and dad to leave before
you came out?

20
21   "A Because my dad seemed mad at me, and I didn't want to talk to him."

22   C-1 testified she left the bathroom but stayed inside her mom's bedroom. The
bedroom door was closed and "I didn't leave."

23   C-1 testified she did not know if anyone called the police, and she did not recall
talking to an officer or anyone else about what happened. The prosecutor reviewed C-1's
24   prior statements about the incident and asked C-1 if she remembered making the
statements. C-1 testified she did not remember making any of the statements. The
25   prosecutor then asked if certain things described in her prior statements actually
happened. C-1 testified she remembered certain things that happened that day. The
26   prosecutor went through each of C-1's prior statements and C-1 explained whether she
remembered that particular fact. C-1 testified she remembered that her dad was on the
27   telephone with Donna from technical assistance, and she went back to her bedroom
because her dad was on the phone with Donna. She denied that her dad yelled at her to
28   come back and help him but testified that he told her to help him two or three times. She

5

remembered that she went into the living room, and her dad asked, "why can't you be more like Donna." She remembered that she replied that she did not want to be like Donna.

"Q Okay. And then you saw your father get-you told the person that you saw your father get very angry. Do you remember that?

"A No.

"Q *Do you remember that happening?*

"A *Like he got kind of mad, not angry.*

"Q Not angry, just kind of mad?

"A (Nods head.)

"Q Okay. And then he started to hit you. Do you remember telling the person that?

"A No.

"Q *Do you remember that happening?*

"A *No.*

"Q Okay. And then you said that your dad was hitting you with his hands across your face. Do you remember telling the person that?

"A No.

"Q Do you remember that happening?

"A No.

"Q Okay. And then you weren't certain, but you told the person that you believed that your father may have had a shoe in his hand when he was striking you. Do you remember telling that person that?

"A No.

"Q Do you remember that happening?

"A No." (italics added.)

C-1 testified that she did not remember telling anyone that her father pulled her hair, and that incident did not happen.

"Q All right. And then [you said] that he forced you to the couch. Do you remember telling the person that that happened?

"A No.

"Q And did that happen?

6

"A *I don't know.*

"Q You don't know if that part happened?

"A Hum-um.

"Q Okay. And then you told the person that you started to scream. Do you remember that?

"A No.

"Q Did that happen, did you scream?

"A *I don't know.*" (italics added.)

C-1 testified that she remembered telling someone that her mother came out to help her. "My mom came out" and "[t]hen they left." When asked if her father took the cordless phone from her mother, C-1 testified that she did not know if that happened. C-1 testified she got scared, ran into the bathroom, and locked herself in until she heard her parents leave.

"Q Okay. What about-why would that matter to you about whether your mom left, was your mom mad at you?

"A Because my mom was talking to my dad so they were both talking so I didn't want them both there."

On cross-examination, C-1 testified that when she fell on the step, her eye hit the corner of the step and she was bleeding.

*C-2's trial testimony*

C-2 also testified as a prosecution witness, and she readily answered the prosecutor's initial questions about her school and classmates. C-2 testified they had a computer at home, and she asked C-1 for help when she used it.

C-2 testified she did not remember C-1 being cut and bruised around the eye.

"Q Okay. If I was to show you a picture of your sister with cuts around the eye and some bruising would that help you, or would you rather not see it?

"A No, I do not want to see that."

C-2 testified she did not remember C-1 and her dad arguing about the computer.

"Q *Okay. If you could remember it, would you want to talk about it today?*

"A *No.*" (italics added.)

C-2 testified she did not remember speaking to an officer or anyone else about an argument between her parents and sister.

The prosecutor reviewed C-2's prior statements about the incident, and asked if she remembered making the statements to someone and whether such things happened. C-2 testified that she did not remember making any of the statements. However, she gave

conflicting answers as to whether the events described in those prior statements actually happened. She did not think that she was injured that day. She did not remember running into the living room to see what the yelling was about, seeing her dad push her mom as she was walking away from him, that C-1 was sitting on the couch, or that her dad told her mom not to call the police or he would go away for a long time.

When asked if she remembered getting between her mom and dad to stop fighting, C-2 testified, "I don't think so." C-2 testified she did not remember seeing her father take the phone away from her mother, or that her father left the apartment and yelled that he was not coming back.

*Dr. Fields's testimony*

Dr. Donald Fields, the Medical Director for the Child Advocacy Program at Children's Hospital Central California, testified that his primary responsibilities included evaluation of patients suspected of being child abuse victims. He had seen thousands of patients, and testified about children's injuries in many abuse cases.

Dr. Fields did not conduct a physical examination of C-1, meet with her, or review her medical records. He reviewed the photographs of C-1's injuries, however, and extensively testified about the nature of those injuries. He described very deep red marks, along with yellowish-green marks, around C-1's right eye. There was a reddish area to the left of the right eye, a "linear mark" just above the right eyebrow, and a light red area just below the right lower eyelid. There was a greenish-brown area to the right and below the right eye, just in front of the right ear.

Dr. Fields described a "great big yellowish mark" that encompassed the red mark on C-1's right cheek. There were brown/yellow areas from the top lip up to the bottom of the lowest red area. There were reddish-brown areas on the right side of her nose. There were small red lines on her right cheek, a pinkish line below the left lower eyelid, and a circular, light reddish area on the left side of C-1's forehead. There were also large and small reddish marks on the upper right shoulder.

Dr. Fields testified that bruises cannot be accurately aged, but the very bright red marks on C-1's body indicated she suffered new bruises within one or two days of the photographs, while the yellow, brown, and green marks were from older injuries. Dr. Fields was concerned about the presence and nature of the bruises, and explained the bruises were in multiple stages of healing in areas "where you wouldn't normally find them. How often are you going to find bruises in this area on a child this size who can't tell you exactly how it happened.... I mean they're all over the place."

In response to hypothetical questions, Dr. Fields testified such multiple injuries were inconsistent with a child falling down and knocking her head on a coffee table. He explained that a coffee table has a linear surface whereas a child's face is round, and a child would have injuries to the right eye and ear in a linear fashion, rather than bruises all over the side of her face. "So you've got to be able to explain all of them not just a few of them." Such injuries were also inconsistent with a child falling down on a step because the step was "no different than the table ... [a]nd plus you also have bruises in multiple stages of healing. So it's not one injury." Dr. Fields testified that hypothetical examples of falling into a table or on a step were also inconsistent with injuries being suffered on the face and the back.

In response to another hypothetical, Dr. Fields testified such injuries were consistent with a person being beaten about the head and body with the hands, over a series of different times, because there were bruises "all over the place."

"You have bruises over what we call the curvature areas. You also have bruises in areas that would be considered the softer areas which are difficult to actually bruise. Those are not bruises of typical childhood play. And you also have bruises that are on the areas which are the softer areas which are not typical of normal childhood play. And in addition, you also have bruises in multiple stages of healing. So again, you still have to explain all of those. And it wouldn't be a single beating, it would be more than one."

During the redirect examination of Dr. Field, the prosecutor introduced the tape-recording of G.'s telephone call to the 911 dispatcher, and it was played for the jury. Thereafter, the prosecutor asked Dr. Fields whether C-1's injuries, as depicted in the photographs, were consistent with G.'s statements that defendant was beating C-1. Dr. Fields said the injuries were consistent based on his expertise.[FN5]

FN5. As we will discuss in issue II, *post,* defense counsel objected to the introduction of G.'s statements to the 911 operator under the confrontation clause and *Crawford,* and for Dr. Fields's to testify about opinions based upon G.'s statements. The court overruled the Sixth Amendment objection.

*Defense evidence*

G., defendant's wife, was called by the defense before the jury, and testified she was the mother of C-1 and C-2. When asked if she placed a 911 call, she claimed her Fifth Amendment right not to testify and refused to answer further questions.

(See Resp't's Mot. Dismiss, Ex. 2.)

## DISCUSSION

I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008 (1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v.

1    *Murphy*, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's

2    enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore

3    governed by its provisions.

4    II.    Standard of Review

5           Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

6    barred unless a petitioner can show that the state court's adjudication of his claim:

7           (1) resulted in a decision that was contrary to, or involved an unreasonable
            application of, clearly established Federal law, as determined by the Supreme
8           Court of the United States; or

9           (2) resulted in a decision that was based on an unreasonable determination of the
            facts in light of the evidence presented in the State court proceeding.

10   28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

11   (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

12          As a threshold matter, this Court must "first decide what constitutes 'clearly established

13   Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

14   *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

15   Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

16   of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

17   'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

18   set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

19   the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

20   principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

21   . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

22   review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van

23   Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

24   Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

25   end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

26   at 126; Moses, 555 F.3d at 760.

27          If the Court determines there is governing clearly established Federal law, the Court must

28

10

1   then consider whether the state court's decision was "contrary to, or involved an unreasonable

2   application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28

3   U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if

4   the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

5   question of law or if the state court decides a case differently than [the] Court has on a set of

6   materially indistinguishable facts."  Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

7   72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in

8   character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third

9   New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to

10  [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

11  governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

12  clearly established Supreme Court precedent, the state decision is reviewed under the pre-

13  AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

14         "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

15  the state court identifies the correct governing legal principle from [the] Court's decisions but

16  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

17  "[A] federal court may not issue the writ simply because the court concludes in its independent

18  judgment that the relevant state court decision applied clearly established federal law erroneously

19  or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411; see also Lockyer,

20  538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

21  could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

22  Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

23  correctness of the state courts decision, the decision cannot be considered unreasonable.  Id.  If

24  the Court determines that the state court decision is objectively unreasonable, and the error is not

25  structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

26  effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

27         Petitioner has the burden of establishing that the decision of the state court is contrary to

28  or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

11

1    Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

2    states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

3    state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

4    Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

5         AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1)

6    is limited to the record that was before the state court that adjudicated the claim on the merits,"

7    and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

8    Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state

9    courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v.

10   Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court

11   factual finding is not entitled to deference if the relevant state court record is unavailable for the

12   federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

13   Tamayo-Reyes, 504 U.S. 1 (1992).

14   II.    Review of Claims

15         A.  Out-of-Court Statements by C-1 and C-2

16         In his first claim, Petitioner alleges the trial court erroneously admitted the out-of-court

17   statements of C-1 and C-2 as prior inconsistent statements.

18         This claim was presented on direct appeal to the Fifth DCA which denied the claim in a

19   reasoned decision. (See Resp't's Mot. Dismiss, Ex. 2.)  Petitioner then raised the claim to the

20   California Supreme Court where it was summarily denied. (See Resp't's Mot. Dismiss, Ex. 4.)

21   When the California Supreme Court's opinion is summary in nature, the Court must "look

22   through" that decision to a court below that has issued a reasoned opinion.  Ylst v. Nunnemaker,

23   501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the appellate court analyzed and rejected the

24   claim as follows:

25         *I. Admission of the prior statements of C-1 and C-2.*

26         Defendant contends the trial court erroneously admitted Officer Cardenas's
         testimony about the statements made by C-1 and C-2 when he interviewed them about the
27       incident. Defendant argues the children's prior statements were not inconsistent with their
         trial testimony, and were not admissible for the truth of the matter asserted therein,
28       because the children were not being evasive in their trial testimony and they truly did not

remember what happened that day.

*A. Background.*

As set forth *ante,* the prosecutor called both C-1 and C-2 as witnesses. Both children testified they did not remember speaking to anyone or making any statements about the incident at their house. The prosecutor reviewed their prior statements and asked the children whether certain incidents occurred. The children gave various answers, ranging from "no" to "I don't know." However, the children also gave detailed answers about certain aspects of defendant's conduct and made equivocal statements as to whether defendant touched them or pushed their mother.

Thereafter, the prosecutor called Officer Cardenas to testify about his interviews with the children. Defense counsel raised a hearsay objection. The prosecutor replied the children's statements to Cardenas were admissible as prior inconsistent statements. The court overruled defense counsel's objections and allowed Cardenas to testify about the children's prior statements. As set forth *ante,* Cardenas testified about the children's prior statements, in which they described defendant hitting C-1, pushing C-2, pushing G. and taking the telephone away from her, and leaving the scene.

After the parties rested, defense counsel moved for a mistrial based on the admission of the children's prior statements to Cardenas and argued their statements were inadmissible as prior inconsistent statements because the children truly did not remember what happened that day, and they were not being purposefully evasive during their trial testimony.

The prosecutor replied both children were questioned at trial about their prior statements and whether such incidents occurred, and the court observed their equivocal responses. The prosecutor continued:

"... I hate to accuse them of this, but [C-1 and C-2] were being evasive, purposefully evasive and, in effect, inconsistent with their prior statement.... [T]rue, they were saying I don't remember. They were saying I don't remember in a way that made them inconsistent."

The court denied defendant's mistrial motion and found that based on the children's demeanor, both of them "had a very good, if difficult to have them testify to, recollection of all the facts except certainly [C-1] the victim as to how she hurt herself and what she remembered in that particular instance." The court found the children's failure to recollect supported the introduction of their prior inconsistent statements for the truth of the matter asserted therein.

Defense counsel asked the court to give the jury a limiting instruction, CALCRIM No. 303, that Officer Cardenas's testimony was only admitted to impeach the children's trial testimony and not for the truth of the matter. The court denied the request and found the children's prior inconsistent statements were admissible for the truth of the matter.

*B. Analysis.*

A witness's prior statement that is inconsistent with his or her testimony is admissible so long as the witness is given the opportunity to explain or deny the statement. (Evid.Code, §§ 770, 1235; *People v. Coffman* (2004) 34 Cal.4th 1, 78.) A prior inconsistent statement is admissible not only to impeach a witness's credibility, but also to prove the truth of the matter asserted therein. (*People v. Fierro* (1991) 1 Cal.4th 173, 221 (*Fierro*).) A defendant's Sixth Amendment right to confront and cross-examine a witness

is not violated when the witness who made the prior inconsistent statement is available for cross-examination, even when that witness claims not to remember making the prior statement. (*Crawford, supra,* 541 U.S. 36, 59-60, fn. 9; *People v. Friend* (2009) 47 Cal.4th 1, 42, fn. 24; *Fierro, supra,* 1 Cal.4th at p. 222)

"Generally it is true that the testimony of a witness indicating that he or she does not remember an event is not inconsistent with a prior statement describing the event. [Citation.] 'But justice will not be promoted by a ritualistic invocation of this rule of evidence. Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.' [Citations.]" (*Fierro, supra,* 1 Cal.4th at p. 221.)

"'...'[P]rior statements are not admissible to impeach a witness whose answers to questions are *exclusively* of the 'I-don't-remember' variety.'" [Citation.]" (*Fierro, supra,* 1 Cal.4th at p. 222, italics in original.) "However, courts do not apply this rule mechanically. 'Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful witness.' [Citation.] When a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as there is a reasonable basis in the record for concluding that the witness's 'I don't remember' statements are evasive and untruthful, admission of his or her prior statements is proper. [Citation.]" (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219-1220; *People v. Ledesma* (2006) 39 Cal.4th 641, 711-712.)

We review the trial court's evidentiary rulings, including those involving hearsay issues, under the abuse of discretion standard. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.)

The trial court did not abuse its discretion when it admitted the children's prior statements to Officer Cardenas and found their failure to remember particular details about the incident constituted deliberate evasions. When the prosecutor initially started to question C-1, she seemed too embarrassed to answer questions on any topic and testified she did not remember the incident at her house or talking to anyone about what happened. As the direct examination continued, however, C-1 testified about her injuries, defendant's specific actions and statements, and her reaction to defendant's statements about "Donna" and the computer. C-1 thus demonstrated through the majority of her trial testimony that she remembered the details of the incident which occurred at her house that morning.

C-1 became more evasive, however, when the prosecutor asked whether defendant hit her or pushed her mother. When the prosecutor offered to show C-1 the photographs of her own injuries, C-1 said without equivocation that she did not want to see the photographs. C-1 testified defendant was "mad" rather than "angry" at her, but she could not explain why she felt that she had to stay in the bathroom until she heard defendant leave the residence. When asked if defendant hit her, C-1 testified that he did not do so. When asked if defendant forced her to the couch and she started to scream, C-1 testified that she did not know.

While C-2 did not seem to be embarrassed to testify, she also testified that she did not remember the incident or telling anyone about it.

"Q Okay. If you could remember it, would you want to talk about it today?

"[C-2] No."

14

As the direct examination continued, however, C-2 testified about specific details about defendant's conduct that morning but testified that she did not remember whether defendant pushed her, or hit or pushed C-1 or her mother. C-2 also refused to look at the photographs of C-1's injuries.

Defendant asserts the children's trial testimony demonstrated they truly did not remember what happened in their house and their testimony was not inconsistent with their prior statements to Officer Cardenas. Even if the declarant of a prior statement appears at trial and professes "total inability to recall the crime or her statements to police, and this narrow[s] the practical scope of cross-examination, [the declarant's] presence at trial as a testifying witness gave the jury the opportunity to assess her demeanor and whether any credibility should be given to her testimony or her prior statements. This was all the constitutional right to confrontation required. [Citations.]" (*People v. Perez* (2000) 82 Cal.App.4th 760, 766-767.) "[T]he true point of distinction is not whether the witness selectively remembers some and forgets other circumstances, but rather whether the record supports a finding that the forgetfulness at trial is deliberately evasive." (*Id.* at p. 764.)

"The witness feigning memory loss is in fact subject to cross-examination, providing a jury with the opportunity to see the demeanor and assess the credibility of the witness, which in turn gives it a basis for judging the prior hearsay statement's credibility. '[W]hen a hearsay declarant is present at trial and subject to unrestricted cross-examination ... the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements.' [Citation.] In the face of an asserted loss of memory, these protections 'will of course not always achieve success, but successful cross-examination is not the constitutional guarantee.' [Citation.]" (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420.)

The entirety of the record refutes defendant's argument about the children's claimed inability to remember, and the record provides a reasonable basis to conclude both children were being evasive. Both children testified about the majority of the events that happened in their house that morning, but they either denied or claimed they could not remember if defendant engaged in physical violence against their mother or themselves, and they steadfastly refused to look at the photographs of C-1's injuries. Their claimed inability to recollect was clearly evasive under the circumstances, and the trial court properly admitted the children's statements to Officer Cardenas as prior inconsistent statements. (See, e.g., *People v. Perez, supra,* 82 Cal.App.4th at pp. 766-767.)

(See Resp't's Mot. Dismiss, Ex. 2.)

Petitioner asserts that C-1's and C-2's statements to the detective were inadmissible as a matter of California law. This claim is not cognizable on federal habeas review. See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"); Smith v. Phillips, 455 U.S. 209, 221 (1982) (federal courts "may intervene only to correct wrongs of constitutional dimension"); Jammal v. Van de Kamp, 926

1  F.2d 918, 919 (9th Cir.1991); Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir.1990), *cert. denied*, 498

2  U.S. 1091 (1991) ("incorrect" evidentiary rulings are not the basis for federal habeas relief).

3  Federal courts are bound by state court rulings on questions of state law. Oxborrow v.

4  Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989).

5      The Supreme Court has never held that a prior inconsistent statement may not be

6  admitted to impeach a witness, and Petitioner makes no showing that admission of C-1's and C-

7  2's statements to the detective rose to the level of a constitutional violation.  Although Petitioner

8  alleges a violation of the Constitution, his broad assertion does not transform this claim into a

9  federal one. Merely placing a "due process" label on an alleged violation does not entitle

10 Petitioner to federal relief.  Langford v. Day, 110 F.3d 1386, 1388-89 (1996).  The claim is

11 premised on the interpretation of state law.  It is therefore not cognizable and must be denied.

12 Estelle, 502 U.S. at 67.

13     B.  Admission of 9-1-1 Call - Confrontation Clause

14     In his next ground for relief, Petitioner claims the admission of the taped recording of the

15 9-1-1 call placed by his wife violated his rights under the Confrontation Clause of the Sixth

16 Amendment.

17     This claim was raised in Petitioner's direct appeal to the Fifth DCA and it was denied in a

18 reasoned decision. (See Resp't's Mot. Dismiss, Ex. 2.)  The claim was then raised before the

19 California Supreme Court where it was summarily denied. (See Resp't's Mot. Dismiss, Ex. 4.)

20 Therefore, this Court must "look through" to the decision of the Fifth DCA.  Ylst, 501 U.S. at

21 804-05 & n. 3.  The appellate court denied the claim as follows:

22     *II. Admission of G.'s statements to the 911 operator.*

23         Defendant raises several issues about the court's decision to admit the tape-
        recording of G.'s statements to the 911 operator. Defendant argues G.'s statements were
24     inadmissible testimonial evidence under the Sixth Amendment and *Crawford.* In the
        alternative, he argues that even if G.'s statements were not testimonial, her statements
25     were not admissible under the spontaneous declaration exception to the hearsay rule
        because there was no longer an emergency when G. called 911.

26
        Defendant separately argues Dr. Fields should not have been permitted to rely on
27     G.'s statements to the 911 operator to give his opinion about the nature of C-1's injuries,
        and the court should have given the jury an instruction about the limited admissibility of
28     G.'s statements.

We will review the trial court's consideration of these issues, then turn to the case authorities as to testimonial evidence and the spontaneous declaration exception to the hearsay rule, and determine the court properly admitted G.'s statements for the truth of the matter asserted therein.

*A. Background.*

During the pretrial motions, defendant moved to exclude the tape recording of G.'s statements to the 911 operator. The court conducted a hearing pursuant to Evidence Code section 402 as to the admissibility of the tape recording, and the prosecutor intended to call G., defendant's wife, to authenticate the 911 call.

Defense counsel advised the court that according to the defense investigator, G. planned to invoke her Fifth Amendment right not to testify at trial. Counsel asked whether the court should appoint counsel. The court declined to do so: "[W]hen we bring in [G.], we'll determine whether or not she intended to testify. And if she does not, then we will appoint counsel for her."

Thereafter, the prosecutor called G., who was sworn as a witness and stated her name. The court advised G. that the attorneys were going to ask her questions limited to the 911 call, outside the jury's presence, and G. said, "Okay." The court asked G. to let him know if she did not hear or understand a question, and she again said "Okay."

In response to the prosecutor's questions, G. testified that she called 911 on April 15, 2007, and spoke to a 911 operator. G. did not have an independent recollection of what she told the operator. The prosecutor showed the transcript of the 911 call to G. and asked her to read it. G. testified that she recalled some of the words she said. The prosecutor played the tape recording of the 911 call, and asked G. if that was her voice. G. testified: "Um, yes. I've never heard myself. That doesn't sound like me, but yes." Defense counsel declined to conduct cross-examination.

The court advised G. that it had been advised "that if called to testify in front of the jury that you were going to refuse to answer questions." G. said that was true. The court appointed an attorney to represent and advise G. as to whether she would testify before the jury.

After a recess, G.'s attorney stated that he advised G. to claim her Fifth Amendment privilege not to testify. Defense counsel asked the prosecutor if he would grant immunity to G., and the prosecutor said no. Defense counsel moved to strike G.'s hearing testimony as to the authentication of the 911 tape because she did not have an attorney before she testified at that hearing. The court overruled the objection.[FN6]

FN6. Defendant does not challenge this ruling on appeal.

At trial, the prosecution did not call G. as a witness. As set forth *ante,* Dr. Fields testified as the prosecution's expert as to the nature of C-1's injuries as depicted in the photographs. On redirect examination, the prosecutor played the tape recording of the 911 call and asked Dr. Fields whether C-1's injuries were consistent with G.'s statements to the 911 operator. Defense counsel objected to the 911 call and Dr. Fields's response, and argued the evidence violated defendant's Sixth Amendment rights under *Crawford.* The court overruled the objection, the tape recording was played, and Dr. Fields testified C-1's injuries were consistent with G.'s statements on the 911 call.

After the parties rested, defense counsel moved for a mistrial and again argued G.'s statements to the 911 operator were testimonial and violated defendant's Sixth

Amendment rights under *Crawford* because G. refused to testify at trial and she was not subject to cross-examination. Defense counsel further argued that even if G.'s statements were not testimonial, her statements were still inadmissible hearsay and not spontaneous declarations because there was no evidence as to when the alleged incident happened compared to the 911 call since G. refused to testify about how or why she placed the call.

Defense counsel further argued the tape recording should not have been introduced as the basis for Dr. Fields's opinions about the nature of C-1's injuries. Counsel requested the court to give a limiting instruction to the jury (CALCRIM No. 303), that the tape recording was not introduced for the truth of the matter but only to assist the expert witness.

The court denied defendant's motion for mistrial and found G. authenticated the 911 tape recording prior to claiming a Fifth Amendment right not to testify before the jury. The court noted that 911 calls generally are not testimonial under *Crawford,* and the 911 call in this case was sufficiently contemporaneous to the incident that G.'s statements were admissible for the truth of the matters asserted therein as spontaneous declarations. The court also denied defendant's request for a limiting instruction.

*B. The 911 call and Crawford*

Defendant contends G.'s statements to the 911 operator were testimonial and inadmissible pursuant to the Sixth Amendment and *Crawford* because G. refused to testify at trial and she was not subject to cross-examination. In *Crawford,* the United States Supreme Court held the Sixth Amendment bars the admission of out-of-court testimonial statements unless the witness is both unavailable and the defendant had a prior opportunity to cross-examine the witness. (*Crawford, supra,* 541 U.S. at pp. 59, 68.) *Crawford* did not set forth "a comprehensive definition" of testimonial evidence but held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Id.* at p. 68.) *Crawford* held that where the proffered statement is nontestimonial, state law may regulate the admission of evidence by applying statutory hearsay rules without running afoul of the confrontation clause. (*Ibid.*)

In *Davis v. Washington* (2006) 547 U.S. 813 (*Davis* ), the court determined "when statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause." (*Id.* at p. 817.) *Davis* addressed two cases with different factual situations. In one case, a domestic disturbance victim called 911 and described the perpetrator's actions to the operator as she was being assaulted. In response to the operator's specific questions, the victim reported the perpetrator's name, described how he was attacking her, and identified her location. The victim started to ramble and the 911 operator admonished her to "'[s]top talking and answer my questions.'" As the call progressed, the victim said the perpetrator had just run out the door and was leaving in a car. At trial, the victim did not appear and the prosecution introduced the tape recording of the 911 call. (*Id.* at pp. 817-819.)

*Davis* also addressed the facts of a companion case, in which officers arrived at the home of a domestic violence victim shortly after she had been assaulted. The perpetrator was still at the house and tried to interfere as the victim spoke to the officers. The officers separately interviewed the victim about the incident, and she signed a written battery affidavit about how the perpetrator attacked her. The victim refused to appear at trial, and the prosecution introduced the testimony of the officers who interviewed her. (*Id.* at pp. 819-821.)

*Davis* offered the following definition of testimonial statements under *Crawford* and the Sixth Amendment:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra,* 547 U.S. at p. 822.)

*Davis* relied on this definition and held that in the first case, the victim's statements to the 911 operator were admissible and not testimonial under *Crawford.* The court held that the initial interrogation conducted in connection with a 911 call "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis, supra,* 547 U.S. at p. 827.) The victim who called 911 was "speaking about events *as they were actually happening,* rather than 'describ[ing] past events ...'" (*Ibid.,* italics in original.) The victim "was facing an ongoing emergency" and her 911 call "was plainly a call for help against a bona fide physical threat." (*Ibid.*) Moreover, the questions posed by the 911 operator did not turn the victim's statements into testimonial evidence because "the nature of what was asked and answered ... again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn ... what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Citations.]" (*Ibid.*) The victim's "frantic answers" were provided "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Ibid.*)

*Davis* thus concluded the circumstances of the 911 operator's "interrogation" of the victim "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. [The victim] simply was not acting as a *witness;* she was not *testifying.* What she said was not 'a weaker substitute for live testimony' at trial ... [citations] ... No 'witness' goes into court to proclaim an emergency and seek help." (*Davis, supra,* 547 U.S. at p. 828, italics in original.)

However, *Davis* also held that once the 911 operator "gained the information needed to address the exigency of the moment, the emergency appears to have ended (when [the perpetrator] drove away from the premises)." (*Davis, supra,* 547 U.S. at p. 828.) At that point, the victim's statements were testimonial and the 911 operator's questions were "not unlike the 'structured police questioning,'" which was found testimonial in *Crawford.* (*Id* . at pp. 828-829.)

In contrast, *Davis* held the victim's statements to the police officers in the companion case were testimonial and inadmissible in the absence of the victim's trial testimony. The victim told the officers that things were fine. Her statements were given through a written affidavit, as part of an investigation into possible past criminal conduct, and there was no emergency or immediate threat to the victim. (*Davis, supra,* 547 U.S. at pp. 827, 829-830, 819-821.) The officers did not ask questions to determine "'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime-which is, of course, precisely what the officer *should* have done." (*Id.* at p. 830, italics in original.)

A series of California cases have found that a declarant's statements to a 911 operator are not testimonial under *Crawford.* In *People v. Corella* (2004) 122

Cal.App.4th 461 (*Corella*), defendant's wife called 911 and reported to the operator that defendant hit her and repeated the accusation to a police officer and medical personnel who responded to the call. At the preliminary hearing, defendant's wife claimed her prior accusations were false, and she refused to testify at trial. The trial court found the wife's initial statements to the 911 operator were not testimonial under *Crawford* and admitted her statements as spontaneous declarations. (*Id.* at pp. 464-465.)

*Corella,* which was decided prior to *Davis,* anticipated much of the United States Supreme Court's reasoning in that case, and held the wife's statements to the 911 operator were not testimonial under *Crawford. Corella* noted the wife's statements were not "'knowingly given in response to structured police questioning,' and bear no indicia common to the official and formal quality of the various statements deemed testimonial by *Crawford.* [Defendant's wife], not the police, initiated the 911 call to request assistance.... Not only is a victim making a 911 call in need of assistance, but the 911 operator is determining the appropriate response. The operator is not conducting a police interrogation in contemplation of a future prosecution." (*Corella, supra,* 122 Cal.App.4th at p. 468.)

In *People v. Brenn* (2007) 152 Cal.App.4th 166 (*Brenn* ), defendant and the victim lived at a group home and got into a fight over defendant's girlfriend. Defendant grabbed a knife and stabbed the victim in the stomach. The victim left the group home, went to another location, called 911, and reported the stabbing. The 911 operator asked the victim who stabbed him and how it happened. The victim identified defendant, explained they were fighting about defendant's girlfriend, and described the fight in detail. The operator asked the victim several questions about defendant's location, whether he had mental health problems, and if he still had a knife, and the victim answered to the best of his knowledge. (*Id.* at pp. 170-171.)

*Brenn* held the victim's statements to the 911 operator were not testimonial under *Crawford* and *Davis* because "the purpose and form of the statements were not the functional equivalents of trial testimony." (*Brenn, supra,* 152 Cal.App.4th at p. 176.) Brenn further held there was no material difference between *Davis's* 911 call and victim's statements to the 911 operator about the stabbing. (*Id.* at p. 176-177.) *Brenn* held the victim's statements about the stabbing were made "in response to rapid-fire questioning from the dispatcher. There was nothing formal, solemn, or structured about the colloquy. And unlike a criminal prosecutor, the dispatcher was primarily concerned with what was happening at the moment, as opposed to what had happened in the past. The dispatcher was eliciting information in an attempt to assess the present situation and help [the victim] and the responding officers, not secure a conviction in a court of law." (*Id.* at p. 177.) *Brenn* discounted the fact that the victim told the 911 operator that he wanted to press charges against the defendant: "[I]t does not appear that his *primary purpose* during the call was to establish past facts for use in a criminal trial, or that the 911 operator was concerned about that issue.... '[T]he proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively,* are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial.' [Citation.]" (*Ibid.,* italics in original)

*Brenn* also rejected the defendant's argument that the victim was no longer facing an emergency as he spoke to the 911 operator about the stabbing and noted such a claim was "much easier to make from a law office than from 100 feet from someone who has just stabbed you." (*Brenn, supra,* 152 Cal.App.4th at p. 177.) The victim was suffering a stab wound and defendant was still at large. "It is hard to construct a definition of the word 'emergency' that this scenario does not fit." (*Ibid.*) The victim's information was important to help the police "formulate an appropriate response to the situation. It does

not appear the information was elicited or provided for the primary purpose of making a case against [defendant] at trial." (*Ibid.*)

In *People v. Banos* (2009) 178 Cal.App.4th 483 (*Banos*), the court addressed the admissibility of several out-of-court statements made by a domestic violence victim who was later murdered by defendant. In March 2004, the victim called 911 and, in response to the dispatcher's questions, identified herself and said she had a restraining order against defendant, but he was at her apartment and she was afraid he was going to attack her. The victim explained she was calling from a phone booth because he was dangerous, he had been arrested a few months earlier for attempted murder, and he was not supposed to be near her. (*Id.* at pp. 488, 492.)

*Banos* held the victim's statements to the 911 operator in March 2004 were not testimonial under *Davis* and *Crawford*. (*Banos, supra,* 178 Cal.App.4th at pp. 492-493, 497.) The victim's "primary purpose for making the statements to the 911 dispatch officer was to gain police protection. The statements were not yet the product of an interrogation, rather they were made to police conducting an investigation into an ongoing emergency." (*Id.* at p. 497; see also *People v. Byron* (2009) 170 Cal.App .4th 657, 661-662, 675 [victim's statements about defendant's assault on her, in response to questions posed by 911 operator, were not testimonial under *Davis* and *Crawford*].)

As in *Davis* and the California cases, G.'s statements to the 911 operator were not testimonial under *Crawford,* the court properly admitted her statements even though she refused to testify and was not subject to cross-examination, and defendant's Sixth Amendment rights were not violated. At the beginning of the call, G. said she needed an officer and the 911 operator simply asked G. what was going on. G. recited specific details of defendant's assault on her daughter and herself without further prompts or questions. G. explained that she made the call almost simultaneously with the incident and there was a brief delay only because "the damn phone was hooked to the internet." As the call continued, G. responded to the 911 operator's questions about defendant's identity and whereabouts, and whether he was armed. The 911 operator's questions did not turn G.'s statements into testimonial evidence because the operator asked the questions "in an attempt to assess the present situation and help [the victim] and the responding officers, not secure a conviction in a court of law." (*Brenn, supra,* 152 Cal.App.4th at p. 177.) G.'s "primary purpose for making the statements to the 911 dispatch officer was to gain police protection. The statements were not yet the product of an interrogation, rather they were made to police conducting an investigation into an ongoing emergency." (*Banos, supra,* 178 Cal.App.4th at p. 497.)

Defendant asserts the trial court improperly relied upon *Corella,* and that *Corella's* reasoning is invalid in light of *Davis's* subsequent analysis of statements made during 911 calls. Defendant argues that since *Davis* was decided, "[i]t is now well established that answers to questions from an agent of the police that are designed to determine facts about a crime that has been committed, and not to address an ongoing emergency, are testimonial and may violate the Confrontation Clause where the declarant is unavailable for cross-examination." Defendant insists the primary purpose of G.'s 911 call was not to address an ongoing emergency since defendant had left the house, the 911 operator used the call to gather information about a completed crime, and G.'s statements were testimonial under *Crawford.*

Defendant's arguments are based on the supposition that any emergency in G.'s house was over when she called 911. As explained in *Brenn,* however, such an argument is much easier to make in retrospect and "from a law office," rather than in the immediate aftermath of a physical assault by a husband and father upon his wife and child, when the victim is not sure of the perpetrator's exact location. (*Brenn, supra,* 152 Cal.App.4th at p.

21

177.) In addition, *Davis* did not undermine *Corella's* analysis of the *Crawford* issue, and held that a 911 call "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." (*Davis, supra,* 547 U.S. at p. 827.) *Davis* held the victim's call in that case "was plainly a call for help against bona fide physical threat." (*Ibid.*) Moreover, the questions posed by the 911 operator in *Davis* did not turn the victim's statements into testimonial evidence because "the nature of what was asked and answered ... again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn ... what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Citations.]" (*Ibid.,* italics in original.)

G.'s statements to the 911 operator were not testimonial. Without any prompting, G. reported that defendant beat her daughter, she pulled him off the child, he chased and attacked G., and he threw the younger child to the ground. G. further reported that defendant left the house in his car and she thought he might head to his aunt's house, but she really had no idea of his whereabouts. Officer Cardenas testified that when he arrived and encountered G., she was upset and "visibly shaken." G. "blurted" out that she and defendant had been in a disturbance just before Cardenas's arrival. As explained in *Brenn,* "[i]t is hard to construct a definition of the word 'emergency' that this scenario does not fit," and G.'s statements to the 911 operator were important to help the police "formulate an appropriate response to the situation. It does not appear the information was elicited or provided for the primary purpose of making a case against [defendant] at trial." (*Brenn, supra,* 152 Cal.App.4th at p. 177.) G.'s 911 call for help was not testimonial because she "was not acting as a *witness;* she was not *testifying.* What she said was not 'a weaker substitute for live testimony' at trial ... [citations].... No 'witness' goes into court to proclaim an emergency and seek help." (*Davis, supra,* 547 U.S. at p. 828, italics in original.)

We thus conclude G.'s statements to the 911 operator were not testimonial and defendant's Sixth Amendment rights were not violated by the introduction of the evidence in the absence of his ability to cross-examine G.

(See Resp't's Mot. Dismiss, Ex. 2.)

The Confrontation Clause of the Sixth Amendment gives a defendant the right "to be

confronted with the witnesses against him."  U.S. Const. amend. VI.  This right extends to

defendants in state as well as federal criminal proceedings.  Pointer v. Texas, 380 U.S. 400

(1965).  In Crawford v. Washington, 541 U.S. 36, 53-54 (2004), the United States Supreme

Court held that the Confrontation Clause bars the admission of testimonial hearsay unless the

declarant is unavailable and the accused had "a prior opportunity for cross-examination." The

Crawford holding abrogated, in part, the prior rule that the admission of testimonial hearsay did

not violate the Confrontation Clause if the declarant was unavailable and the statement fell under

a "firmly rooted hearsay exception" or otherwise bore indicia of reliability. Ohio v. Roberts, 448

U.S. 56, 66 (1980). "Although Crawford did not define 'testimonial' or 'nontestimonial,' it made

clear that the Confrontation Clause was concerned with 'testimony,' which includes "at a minimum, . . .prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and ... police interrogations." Crawford, 541 U.S. at 68.

In 2006, the Supreme Court decided together Davis v. Washington and Hammon v. Indiana, 547 U.S. 813 (2006), in a further step to "determine more precisely which police interrogations produce testimony" and therefore implicate a Confrontation Clause bar. Id. at 822. In Davis, the Supreme Court explained that in Crawford, the Court was concerned with:

> interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial."

Davis, 547 U.S. at 826.

In Davis, the victim made the statements at issue during a 9-1-1 call during a domestic disturbance. The victim told the operator: "He's here jumpin' on me again," and, "He's usin' his fists." Id. at 817. The operator then asked the victim for the perpetrator's first and last names and middle initial, and at that point in the conversation the victim reported that the perpetrator had fled in a car. Id. at 818. The victim was unavailable at the trial, and the State introduced the recording of her 9-1-1 call. Id. at 819.

In Hammon, the police responded to a home on a domestic disturbance call where they found the victim alone on the front porch. 547 U.S. 813. The victim appeared "somewhat frightened," but told them "nothing was the matter." Id., quoting Hammon v. State, 829 N.E.2d 444, 446-447 (Ind.2005). She permitted the police to enter the house where they saw a gas heating unit with the glass front shattered on the floor. Hammon, 547 U.S. at 819-820. One officer remained in the kitchen with the perpetrator while the other officer talked with the victim in the living room. Id. The perpetrator attempted several times to intervene in the victim's conversation with the officer, but he was kept apart. Id. The police then asked the victim to fill out and sign a battery affidavit, and she wrote: "Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter." Id. at 820. The victim

1    was unavailable for trial, so the police officers testified with respect to her statements, and they

2    authenticated the affidavit. Id.

3         In addressing these cases, the Supreme Court discussed the concept of an ongoing

4    emergency:

5         Statements are nontestimonial when made in the course of police interrogation under
          circumstances objectively indicating that the primary purpose of the interrogation is to
6         enable police assistance to meet an ongoing emergency. They are testimonial when the
          circumstances objectively indicate that there is no such ongoing emergency, and that the
7         primary purpose of the interrogation is to establish or prove past events potentially
          relevant to later criminal prosecution."

8

9    Davis, 547 U.S. at 822.

10        In light of this definition, the Supreme Court examined the Davis and Hammon

11   statements and held that the statements at issue in Davis were nontestimonial and the statements

12   in Hammon were testimonial. Id.  The Court characterized the Davis statements as

13   nontestimonial because the victim was "speaking about events as they were actually happening,

14   rather than 'describ[ing] past events,'" that there was an ongoing emergency, that the "elicited

15   statements were necessary to be able to *resolve* the present emergency," and that the statements

16   were not formal. 547 U.S. at 827.  In Hammon, the Supreme Court held that, "[i]t is entirely clear

17   from the circumstances that the interrogation was part of an investigation into possibly criminal

18   past conduct." Id. at 829.  There was "no emergency in progress." Id. The officer questioning the

19   victim "was not seeking to determine ... 'what is happening,' but rather 'what happened.'" Id. at

20   830.  It was "formal enough" that the police interrogated the victim in a room separate from her

21   husband where, "some time after the events described were over," she "deliberately recounted, in

22   response to police questioning, how potentially criminal past events began and progressed." Id.

23   Because the victim's statements "were neither a cry for help nor the provision of information

24   enabling officers immediately to end a threatening situation," the Supreme Court determined that

25   they were testimonial. Id. at 832.

26        In this case, the state court decision was not an unreasonable application of clearly

27   established Supreme Court precedent.  The statements at issue were made to a 9-1-1 operator.

28   As Respondent correctly notes, the Supreme Court in Davis "explicitly reserved the question of

'whether and when statements made to someone other than law enforcement personnel are

'testimonial.[3]'" Michigan v. Bryant, __ U.S.__, 131 S.Ct. 1143, 1155 n.3 (2011), *quoting* Davis,

547 U.S. at 823 n.2.  Since the Supreme Court has not squarely resolved this issue, federal

habeas relief is barred. Musladin, 549 U.S. 70.

　　　　Moreover, even if the Court were to consider the statements, it cannot be said that the

state court determination was objectively unreasonable.  The "primary purpose" of the victim's

9-1-1 call was to "to enable police assistance to meet an ongoing emergency." Davis, 547 U.S. at

822.  The victim had placed the call almost simultaneously with the incident, and stated she

attempted to do so during the incident but the phoneline had been occupied. She immediately

requested police assistance and notified the operator of the assault on her and her daughter by

Petitioner.  The operator then asked questions regarding Petitioner's identity, his whereabouts,

and whether he was armed.  These questions were an effort to assess the situation and to enable

police assistance.  Their primary purpose was not to create an out-of-court substitute for trial

testimony.  Thus, state court reasonably determined that the statements were nontestimonial and

did not violate the Confrontation Clause.

　　　　Petitioner fails to demonstrate that the state court's decision was "contrary to, or involved

an unreasonable application of, clearly established Federal law," or an "unreasonable

determination of the facts in light of the evidence."  The claim must be rejected. 28 U.S.C.

§ 2254(d).

　　　　C.  Admission of 9-1-1 Call - Spontaneous Declaration

　　　　In his next ground for relief, Petitioner claims the admission of the taped recording of the

9-1-1 call placed by his wife violated his rights under the Confrontation Clause of the Sixth

Amendment.

_____

[3]The High Court stated:

If 911 operators are not themselves law enforcement officers, they may at least be agents of law
enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without
deciding the point), we consider their acts to be acts of the police. . . . [O]ur holding today makes it
unnecessary to consider whether and when statements made to someone other than law enforcement
personnel are 'testimonial.'

Davis, 547 U.S. at 823 n.2.

1    This claim was also raised in Petitioner's direct appeal to the Fifth DCA where it was

2    denied in a reasoned decision. (See Resp't's Mot. Dismiss, Ex. 2.)  The claim was raised before

3    the California Supreme Court in a petition for writ of habeas corpus where it was summarily

4    denied. (See Lodged Doc. No. 4.)  Therefore, this Court must "look through" to the decision of

5    the Fifth DCA.  Ylst, 501 U.S. at 804-05 & n. 3.  In denying the claim, the appellate court stated:

6
        Defendant next contends that even if G.'s statements to the 911 operator were not
    testimonial, the trial court erroneously admitted her statements under the spontaneous
7   declaration exception to the hearsay rule. Defendant argues there is no evidence as to
    when G. made the statements compared to when the alleged incident occurred, such that
8   she was not under the stress of the domestic disturbance when she made the statements.

9
        Even if an out-of-court statement is not testimonial under *Crawford,* the statement
    must still be admissible under applicable state evidentiary rules, including hearsay rules.
10  (*Crawford, supra,* 541 U.S. at p. 68; *People v. Cervantes* (2004) 118 Cal.App.4th 162,
    173; *Banos, supra,* 178 Cal.App.4th 483, 494, fn. 3.) Evidence Code section 1240 states
11  the spontaneous declaration exception to the hearsay rule:

12
        "Evidence of a statement is not made inadmissible by the hearsay rule if the
    statement: [¶](a) Purports to narrate, describe, or explain an act, condition, or
13  event perceived by the declarant; and [¶](b) Was made spontaneously while the
    declarant was under the stress of excitement caused by such perception."
14

15      "The hearsay exception for spontaneous declarations is among those 'firmly
    rooted' exceptions that carry sufficient indicia of reliability to satisfy the Sixth
16  Amendment's confrontation clause. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468,
    529; see also *People v. Rincon* (2005) 129 Cal.App.4th 738, 756-757.)

17      The trial court's determination of the preliminary facts, such as whether the
    declarant was under the stress of excitement when the statements were made, will be
18  upheld if supported by substantial evidence. (*People v. Phillips* (2000) 22 Cal.4th 226,
    235-236; *People v. Brown* (2003) 31 Cal.4th 518, 540-541.) The court's ultimate decision
19  to admit the evidence is reviewed for an abuse of discretion. (*People v. Phillips, supra,* 22
    Cal.4th at p. 236.)
20

21      "'To render [statements] admissible [under the spontaneous declaration
    exception] it is required that (1) there must be some occurrence startling enough to
    produce this nervous excitement and render the utterance spontaneous and unreflecting;
22  (2) the utterance must have been before there has been time to contrive and misrepresent,
    i.e., while the nervous excitement may be supposed still to dominate and the reflective
23  powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the
    occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318
24  (*Poggi*).)

25      "'The foundation for this exception is that if the declarations are made under the
    immediate influence of the occurrence to which they relate, they are deemed sufficiently
26  trustworthy to be presented to the jury. [Citation.] [¶] The basis for this circumstantial
    probability of trustworthiness is "that in the stress of nervous excitement the reflective
27  faculties may be stilled and the utterance may become the unreflecting and sincere
    expression of one's actual impressions and belief."'" [Citation.]" (*Poggi, supra,* 45 Cal.3d
28  at p. 318.)

"The word 'spontaneous' as used in Evidence Code section 1240 means 'actions undertaken without deliberation or reflection....'" (*People v. Gutierrez* (2009) 45 Cal.4th 789, 811 (*Gutierrez*).) "When the statements in question were made and whether they were delivered directly or in response to a question are important factors to be considered on the issue of spontaneity. [Citations.] ... 'Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.*' [Citation.]" (*Poggi, supra,* 45 Cal.3d 306, 319, italics added in original.)

"The crucial element in determining whether an out-of-court statement is admissible as a spontaneous statement is the mental state of the speaker. [Citation.] 'The nature of the utterance-how long it was made after the startling incident and whether the speaker blurted it out, for example-may be important, but solely as an indicator of the mental state of the declarant.' [Citation.]" (*Gutierrez, supra,* 45 Cal.4th 789, 811.)

"The amount of time that passes between a startling event and subsequent declaration is not dispositive, but will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited." (*Gutierrez, supra,* 45 Cal.4th at p. 810.) The fact that "the declarant has become calm enough to speak coherently also is not inconsistent with spontaneity. [Citations.] To conclude otherwise would render the exception virtually nugatory: practically the only 'statements' able to qualify would be sounds devoid of meaning." (*Poggi, supra,* 45 Cal.3d at p. 319.)

In addition, the fact that a statement is made in response to questioning is "one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity. Thus, an answer to a simple inquiry has been held to be spontaneous. [Citations.] More detailed questioning, in contrast, is likely to deprive the response of the requisite spontaneity. [Citations.] But ultimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter. [Citation.]" (*People v. Farmer* (1989) 47 Cal.3d 888, 904, overruled on other grounds by *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

We have already reviewed a series of cases which found that victim statements to 911 operators were not testimonial under *Crawford.* These cases also found the nontestimonial statements were admissible as spontaneous declarations. In *Corella,* the court held the victim's statements about the defendant's assault upon her were nontestimonial and admissible as spontaneous declarations. (*Corella, supra,* 122 Cal.App.4th at pp. 468-469.)

"[I]t is difficult to identify any circumstances under which a ... spontaneous statement would be 'testimonial.' The rationale of the spontaneous statement exception to the hearsay rule is that the utterance must be made without reflection or deliberation due to the stress of excitement. [Citation.] [The victim's] statements were ultimately used in a criminal prosecution, but statements made without reflection or deliberation are not made in contemplation of their 'testimonial' use in a future trial." (*Id.* at p. 469; see also *People v. Pedroza* (2007) 147 Cal.App.4th 784, 794.)

*Brenn* similarly held the stabbing victim's statements to the 911 operator were spontaneous declarations because he made the call "within minutes" of the stabbing, his statements "clearly related" to the stabbing, and it was "not dispositive" that some of his statements were given in response to the operator's questions. (*Brenn, supra,* 152 Cal.App.4th at p. 173.) The victim's answers were fragmented and he was somewhat unresponsive, which indicated "a clear lack of deliberation and measured thoughtfulness." (*Ibid.*)

1

2

3

4

5

6

7

8

9

10

   The trial court herein properly found G.'s statements to the 911 operator were admissible as spontaneous declarations. G. clearly narrated and related details about what defendant had just done to her child and herself. She offered these details in response to the operator's simple questions about why she needed an officer and whether an ambulance was needed. Defendant complains that when G. called 911, the incident already occurred "at some earlier time that morning," and she was no longer under the stress of the excitement of the incident. As G. told the operator, however, "we couldn't call you guys because the damn phone was hooked to the internet." G. did not make an intentional decision to delay calling 911. Instead, her explanation strongly suggests that G.'s level of stress continued and even increased as she vainly tried to call for help for her bleeding daughter but was thwarted by the telephone's internet connection. This inference is supported by Officer Cardenas's description of G. as being upset and "visibly shaken" when he responded to the dispatch, and that she "blurted" out that she and defendant had been in a disturbance that occurred just before Cardenas's arrival.

   The entirety of the record thus reflects G. called 911 while she was still under the stress of the excitement from the domestic disturbance. The court properly admitted G.'s statements as spontaneous declarations for the truth of the matters asserted therein.

(See Resp't's Mot. Dismiss, Ex. 2.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

   Like his first claim for relief, Petitioner asserts the trial court erred in its application of state law, this time with respect to the admission of the 9-1-1 call as a spontaneous declaration. Like the first claim, this claim is not cognizable on federal habeas review. See 28 U.S.C. § 2254(a); Estelle, 502 U.S. 62, 67, (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"); Smith v. Phillips, 455 U.S. 209, 221 (1982) (federal courts "may intervene only to correct wrongs of constitutional dimension"); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir.1991); Tinsley v. Borg, 895 F.2d 520, 530 (9th Cir.1990), cert. denied, 498 U.S. 1091 (1991) ("incorrect" evidentiary rulings are not the basis for federal habeas relief).   Federal courts are bound by state court rulings on questions of state law. Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), cert. denied, 493 U.S. 942 (1989).

25

26

27

28

   Petitioner makes no showing that admission of the 9-1-1 call as a spontaneous declaration rose to the level of a constitutional violation.   Petitioner's broad assertion of a violation of his constitutional rights does not transform this claim into a federal one.   Langford, 110 F.3d at 1388-89.  This claim is not cognizable and must be rejected.  Estelle, 502 U.S. at 67.

D.  Expert's Reliance on 9-1-1 Call

Petitioner alleges the medical expert improperly relied on the recorded 9-1-1 call as a basis for his testimony, because the 9-1-1 call was inadmissible hearsay.  He claims the expert should not have been permitted to rely on Petitioner's wife's statements to the 9-1-1 operator to give his opinion on the nature of C-1's injuries.

Petitioner also raised this claim on direct appeal to the Fifth DCA.  The state court denied the claim in a reasoned decision.  (See Resp't's Mot. Dismiss, Ex. 2.)  The claim was raised before the California Supreme Court in a petition for writ of habeas corpus where it was summarily denied.  (See Lodged Doc. No. 4.)  Therefore, this Court must "look through" to the decision of the Fifth DCA.  Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth DCA analyzed the claim as follows:

> Defendant's next argument is partially based upon his prior attacks on the admissibility of G.'s statements to the 911 operator. Defendant argues that since G.'s statements were both testimonial and inadmissible hearsay, the court improperly permitted the jury to hear the entirety of the tape recording of the 911 call in violation of his Sixth Amendment rights, and the court should have precluded Dr. Fields from relying on G.'s statements "as a basis for an expert's opinion" about the nature and circumstances of C-1's injuries.
>
> We have already found that G.'s statements to the 911 operator were not testimonial, and her statements were admissible for the truth of the matter therein pursuant to the spontaneous declaration exception to the hearsay rule. Defendant's argument about Dr. Fields's testimony also lacks merit. "Since an expert's opinion '"is no better than the facts on which it is based"' [citation], experts should generally be allowed to testify to all facts upon which they base their opinions [citation]." (*People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1324-1325.) "An expert may generally base his opinion on any 'matter' known to him, including hearsay not otherwise admissible, which may 'reasonably ... be relied upon' for that purpose. [Citations.] On direct examination, the expert may explain the reasons for his opinions, including the matters he considered in forming them. However, prejudice may arise if, '"under the guise of reasons,"' the expert's detailed explanation '"[brings] before the jury incompetent hearsay evidence."' [Citations.]" (*People v. Montiel* (1993) 5 Cal.4th 877, 918-919.) "Most often, hearsay problems will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth. [Citation.]" (*Id.* at p. 919.)
>
> The admissibility of an expert's opinion is subject to the trial court's discretion. (*People v. Mendoza* (2000) 24 Cal.4th 130, 177.) The court also has the discretion to exclude from an expert's testimony any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its proper probative value. (*People v. Montiel, supra,* 5 Cal.4th at p. 919.)
>
> As explained *ante,* G.'s statements to the 911 operator were nontestimonial and admissible as spontaneous declarations, such that Dr. Fields did not rely on incompetent

hearsay evidence when he testified that C-1's injuries were consistent with G.'s description of what defendant did to the child. Instead, he relied upon nontestimonial evidence which had been properly admitted under the spontaneous declaration exception to the hearsay rule. More importantly, however, Dr. Fields's opinions about the nature and circumstances of C-1's injuries were not solely based upon G.'s statements to the 911 operator, but upon his review and explanation of the child's injuries as depicted in the photographs that were taken that morning. He carefully described the nature, extent, and locations of the bruises over the child's face and body. He explained how the bruises were different colors, which meant some of the injuries were more recent than the other bruises depicted in the photographs. In response to hypothetical questions, he explained that such injuries could not have resulted from a child falling onto the linear surface of a table or a step, based on the manner in which the bruises extended across the curvature areas of her face and body. The prosecution introduced the 911 tape recording only after Dr. Fields had offered his opinion as to the nature and circumstances of C-1's injuries, such that his additional testimony based upon the tape recording was cumulative.

(See Resp't's Mot. Dismiss, Ex. 2.)

This claim is based on Petitioner's position that the 9-1-1 call placed by the victim was testimonial evidence and that it was improperly admitted in violation of California law. As discussed in the previous claims, however, the statement was reasonably determined to be nontestimonial. Additionally, this Court cannot consider whether the evidence was inadmissible hearsay in violation of California law. The claim must be denied. 28 U.S.C. § 2254(d)(1).

E.  Trial Court's Failure to Give Limiting Instruction

Next, Petitioner argues that the trial court failed to grant defense counsel's request for a limiting instruction concerning the 9-1-1 call. Petitioner maintains that the trial court should have instructed the jury that the recording was "admitted solely as a basis for the expert's opinion and should not be considered for the truth of the matter asserted on the recording." (See Petition at 14.)

Like the previous claims, this claim was raised on direct appeal to the Fifth DCA where it was denied in a reasoned decision. (See Resp't's Mot. Dismiss, Ex. 2.) The claim was then raised before the California Supreme Court in a petition for review where it was summarily denied. (See Resp't's Mot. Dismiss, Ex. 4.) Therefore, this Court must "look through" to the decision of the Fifth DCA. Ylst, 501 U.S. at 804-05 & n. 3. The claim was denied as follows:

Defendant argues the jury was improperly instructed as to how to consider G.'s statements to the 911 operator, and the court should have given a limiting instruction that such evidence was not admitted for the truth of the matter but only as the basis for Dr. Fields's expert opinion.

1
    As we have explained, however, G.'s statements to the 911 operator were not

2
testimonial, they were admissible for the truth of the matter as spontaneous declarations, and Dr. Fields did not rely upon inadmissible hearsay when he gave his opinions about

3
the source of C-1's injuries. We thus conclude the court did not have a duty to give a limiting instruction about the jury's consideration of the tape recording of the 911 call.

4
    Finally, we note that even if G.'s statements to the 911 operator should have been

5
excluded, any error is harmless given the entirety of the record. The children's statements to Officer Cardenas were admissible for the truth of the matter as prior inconsistent

6
statements. The children clearly described defendant's conduct in repeatedly striking C-1, pushing C-2, taking the telephone away from G. and telling her not to call the police,

7
saying that he would go to jail for a long time if the police were called, and leaving the house.

8
(See Resp't's Mot. Dismiss, Ex. 2.)

9
    The Supreme Court has held that the fact that an instruction was allegedly incorrect under

10
state law is not a basis for habeas relief. Estelle v. McGuire, 502 U.S. 62, 71 (1991), *citing*

11
Marshall v. Lonberger, 459 U.S. 422, 438, n. 6 (1983) ("[T]he Due Process Clause does not

12
permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary

13
rules"). Federal habeas courts therefore do not grant relief simply because an instruction may

14
have been deficient. Estelle, 502 U.S. at 72. The only question is "whether the ailing instruction

15
by itself so infected the entire trial that the resulting conviction violates due process." Cupp v.

16
Naughten, 414 U.S. 141, 147 (1973); see also Estelle, 502 U.S. at 72; Henderson v. Kibbe, 431

17
U.S. 145, 154 (1977); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be

18
established not merely that the instruction is undesirable, erroneous, or even "universally

19
condemned," but that it violated some [constitutional right]'"). "It is well established that the

20
instruction 'may not be judged in artificial isolation,' but must be considered in the context of the

21
instructions as a whole and the trial record." Estelle, 502 U.S. at 72, *quoting* Cupp v. Naughten,

22
supra, 414 U.S., at 147. In addition, the Court notes that Petitioner's burden is "especially heavy"

23
with this claim, because "[a]n omission or an incomplete instruction is less likely to be

24
prejudicial than a misstatement of law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). Even if

25
constitutional instructional error has occurred, the federal court must still determine whether

26
Petitioner's suffered actual prejudice, that is, whether the error "had substantial and injurious

27
effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637

28
(1993).

1    In this case, the state court reasonably determined that a limiting instruction was not

2    appropriate.  The statements in the 9-1-1 call were reasonably found to be nontestimonial in

3    nature.  The Court is also bound by the state court's determination that the statements were

4    properly admitted as a spontaneous declaration under California law.  Since the statements were

5    properly admitted, Petitioner cannot show that the trial court's failure to give a limiting

6    instruction respecting its use somehow violated Petitioner's constitutional rights.  Accordingly,

7    the claim must be rejected. 28 U.S.C. § 2254(d)(1).

8    ### F.  Instruction on Flight

9    In his next ground for relief, Petitioner contends the instruction on flight lessened the

10   prosecution's burden of proof in violation of the Sixth Amendment. He argues there was

11   insufficient evidence that he fled the scene to merit a flight instruction.

12   This claim was raised on direct appeal to the Fifth DCA where it was denied in a

13   reasoned decision. (See Resp't's Mot. Dismiss, Ex. 2.)  The claim was then raised before the

14   California Supreme Court in a petition for review where it was summarily denied. (See Resp't's

15   Mot. Dismiss, Ex. 4.)  Therefore, this Court must "look through" to the decision of the Fifth

16   DCA.  Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth DCA analyzed the claim, stating:

17   Defendant next contends the court improperly overruled his objection and
     instructed the jury with CALCRIM No. 372, as to the defendant's flight from the scene,
18   because there is no evidence that he fled the scene with an intent to escape the police.

19   As given to the jury in this case, CALCRIM No. 372 states:

20   "If the defendant fled or tried to flee immediately after the crime was committed,
     that conduct may show that he was aware of his guilt. If you conclude that the
21   defendant fled or tried to flee, it is up to you to decide the meaning and
     importance of that conduct. However, evidence that the defendant fled or tried to
22   flee cannot prove guilt by itself."

23   During the instructional conference, defense counsel objected to CALCRIM No.
     372 as to the defendant's flight, and argued there was no evidence that defendant "was
24   trying to evade law enforcement or leave because he didn't want to get caught doing
     something wrong. He left the house. So we're going to qualify leaving the house as flight
25   from now on then?" The court found the flight instruction was supported by substantial
     evidence because defendant took the telephone from G., said that he would go to prison
26   for a long time if he was arrested, and left the residence.

27   The trial court has a sua sponte duty to give the flight instruction pursuant to
     section 1127c, which "requires that whenever evidence of flight is relied on to show guilt,
28   the court must instruct the jury that while flight is not sufficient to establish guilt, it is a

fact which, if proved, the jury may consider. This statute was enacted to abolish the common law rule that the jury could not be instructed on flight unless there was evidence defendant knew he had been accused. [Citations.]" (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1243; *People v. Henderson* (2003) 110 Cal.App.4th 737, 742.)

"'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt."' [Citations.] Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.] To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328, italics in original.)

"[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." (*People v. Crandell* (1988) 46 Cal.3d 833, 869, disapproved on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) Moreover, the instruction assumes neither the guilt nor the flight of the defendant. (*People v. Campos* (1982) 131 Cal.App.3d 894, 900; *People v. Escobar* (1996) 48 Cal.App.4th 999, 1029, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 911, 914, 923-925.) "Alternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury, not the court, to decide. [Citations.]" (*People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1477.)

"The focus of the instruction is on the defendant and the question of whether there was flight and whether it is reasonable to infer consciousness of guilt from such flight. The instruction goes on to limit the jury's use of the evidence in that it advises the jury that flight alone cannot support a finding of guilt. Thus [the instruction] serves the dual purpose of permitting an inference of guilt, but at the same time provides the defendant with some protection against misuse of such evidence. [Citations.]" (*People v. Henderson, supra,* 110 Cal.App.4th at p. 742.)

Defendant contends the court improperly gave the flight instruction in this case because there was "precious little evidence" he fled from the scene of a crime, or that he knew "that police were coming to his residence and therefore he disappeared to evade arrest." Defendant concedes that he struggled with G. over the telephone, but he argues such evidence showed that he "did not want the police called," and he left the house only after he took possession of the telephone. Defendant thus asserts he "departed with the belief and understanding that no authorities would be called. He never fled, he left."

The entirety of the record refutes defendant's arguments and supports the court's decision to give the flight instruction. There was no dispute that defendant walked out of the residence immediately after the domestic disturbance. G. told the 911 operator that she thought he left. Officer Cardenas testified that when he interviewed C-1, she said defendant pushed G., took a telephone from her, and told G. not to call the police. C-1 said she went into the bathroom and stayed there until she heard defendant go out the front door. C-2 said defendant took the cordless phone from G., and he said "don't call the police or else I'll go to jail for a long time." C-2 said defendant walked out the front door, said "I'm not coming back," and left. Officer Cardenas did not speak to defendant that day because he had left the scene. A dispatch was sent out for defendant and his vehicle, and that he was wanted for child abuse and intimidating a witness.

Defendant argues that he left the residence with the telephone and thus believed

33

G. could not call the police, but this argument raises the contrary inference that defendant fully realized G. *would* try to call the police. In fact, G. was able to place a 911 call by using another phone in the house. Based on this evidence, the jury could have reasonably inferred that defendant fled from his residence because he knew his wife was about to call the police. As the instruction clearly stated, the weight of that inference was a matter for the jury to determine. (See, e.g., *People v. Shea* (1995) 39 Cal.App.4th 1257, 1270.)

Defendant points out that "the purpose of the flight instruction is to protect the defendant from the jury's simply assuming guilt from flight." (*People v. Han* (2000) 78 Cal.App.4th 797, 808.) Based on this salutory purpose, he argues the instruction should not be given when the defendant objects to it or waives the right to have it given. As we have already explained, however, the flight instruction is mandated by statute and must be given "[i]n any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt ...." (§ 1127c; *People v. Pensinger, supra,* 52 Cal.3d at p. 1243; *People v. Henderson, supra,* 110 Cal.App.4th 737, 742.) Defendant cannot "waive" the trial court's statutory duty to give the instruction when supported by the evidence.

Defendant also argues the flight instruction violated his constitutional rights to due process and a jury trial because it reduced the prosecution's burden of proving the charged offense beyond a reasonable doubt, and it presented the jury with an unconstitutional permissive inference of guilt in the absence of any evidence of flight. The California Supreme Court has approved the flight instruction and rejected the identical arguments. (*People v.. Mendoza, supra,* 24 Cal.4th 130, 179-181 [flight instruction does not create unconstitutional permissive inference or reduce prosecution's burden of proof]; *People v. Avila* (2009) 46 Cal.4th 680, 710 [flight instruction does not violate defendant's right to jury trial]; *People v. Navarette* (2003) 30 Cal.4th 458, 502 [same]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1152-1153.)

(<u>See</u> Resp't's Mot. Dismiss, Ex. 2.)

Again, Petitioner's claim is premised on the application of state law. He complains that the trial court violated California law by instructing on flight. For the same reasons previously discussed, this claim is not cognizable on federal habeas review. <u>See</u> 28 U.S.C. § 2254(a); <u>Estelle</u>, 502 U.S. at 67 ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting* <u>Lewis</u>, 497 U.S. at 780; <u>Tinsley</u>, 895 F.2d at 530 ("incorrect" evidentiary rulings are not the basis for federal habeas relief); <u>Oxborrow</u>, 877 F.2d at 1399 (Federal courts are bound by state court rulings on questions of state law); <u>Wright v. Hedgpeth</u>, 2012 WL 1194853, *23 (E.D.Cal.2012) ("whether or not the jury instruction on flight correctly stated California law or was applicable under California law to the charges against petitioner is not cognizable in this federal habeas petition").

Petitioner claims the instruction violated his federal due process rights. However, it is insufficient to show that an instruction is undesirable, erroneous or even "universally

condemned." <u>Donnelly</u> 416 U.S. at 643.  Rather, Petitioner must demonstrate that the instruction

violated some constitutional right. <u>Id</u>.  Petitioner makes no such showing in this case and he

cannot, because the Supreme Court has not found that California's instruction on flight creates an

unconstitutional permissive inference or reduce the prosecution's burden of proof.  Accordingly,

federal habeas relief is barred and the claim must be denied.  <u>Musladin</u>, 549 U.S. 70; 28 U.S.C.

§ 2254(d)(1).

G.  Refusal to Dismiss Prior Conviction

In his final claim for relief, Petitioner alleges the trial court arbitrarily denied him a state

law right and failed to follow state authority during the penalty phase when it refused to dismiss

an allegation of a prior conviction.

Like the previous claims, this claim was raised on direct appeal to the Fifth DCA and was

denied in a reasoned decision. (<u>See</u> Resp't's Mot. Dismiss, Ex. 2.)  The claim was later raised

before the California Supreme Court in a petition for writ of habeas corpus where it was

summarily denied. (<u>See</u> Lodged Doc. No. 4.)  Therefore, this Court must "look through" to the

decision of the Fifth DCA.  <u>Ylst</u>, 501 U.S. at 804-05 & n. 3.  In rejecting this claim, the Fifth

DCA stated:

> The trial court found true the special allegation that defendant had one prior strike
> conviction, assault with a deadly weapon in 1993 (§ 245, subd. (a)(1)). Defendant argues
> the court abused its discretion when it denied his request to dismiss his prior strike
> conviction and imposed the second strike term of eight years in prison.
>
> *A. The probation report*
>
> The probation report set forth defendant's criminal history, which began in July
> 1988, when he was convicted of a misdemeanor violation of Health and Safety Code
> section 11550, subdivision (a), being under the influence of a controlled substance. He
> suffered another conviction for the same offense at a later time. In January 1991, he was
> placed on three years of probation for both convictions. In March 1991, he was placed on
> probation for three years for a misdemeanor violation of section 245, subdivision (a)(1),
> assault with a deadly weapon. In April 1992, defendant was again placed on three years of
> probation for another misdemeanor violation of section 245, subdivision (a)(1), assault
> with a deadly weapon.
>
> In January 1993, defendant was placed on three years of probation for a felony
> conviction of assault with a deadly weapon (§ 245, subd .(a)(1)), the prior strike in this
> case. In May 1993, he was again placed on three years of probation for a misdemeanor
> violation of section 12020, subdivision (a), possession, sale, or manufacture of a weapon.
> In April 2006, he was placed on probation for a misdemeanor violation of section 242,
> battery. On April 16, 2006, a restraining order was issued to keep defendant away from

G.; the order was valid until July 11, 2009.

In July 2006, defendant was placed on probation yet again for misdemeanor violations of section 166, subdivision (a)(1), contempt of court, and section 422, criminal threats, against G., and ordered to attend "batterers" treatment. On April 9, 2007, a bench warrant was issued, and probation was reinstated on June 26, 2007.

On April 15, 2007, defendant was at G.'s residence in violation of the existing restraining order, and he was on misdemeanor probation when he committed the felony offense in this case. Defendant was not arrested that day. On April 16, 2007, the police were recalled to the residence because defendant was outside and knocking on the door. Defendant was arrested without incident.

At the time of his arrest in this case, defendant waived his rights and told officers that the incident occurred because C-1 hid the computer password from him. Defendant claimed C-1 "became defiant and was saying 'bad things to him.'" Defendant said he told C-1 "he was going to 'spank her ass,' then made a move toward her as if he was going to chase her." Defendant said C-1 was only wearing socks, and she ran across the living room, slipped, and fell onto a glass table. Defendant said he told C-1, "'That's what you get.'" He tried to help C-1 but G. confronted him. "When asked if he wanted to hit [C-1], he stated he would have, if he caught her, but she was too fast."

Also according to the probation report, defendant (born in 1964) dropped out of high school when his first wife became pregnant. They had three children and divorced after being married for seven years. Defendant then married G. and they had C-1 and C-2. Defendant denied any gang affiliations, stated he drank alcohol during football season, he only used marijuana when his family members provided it to him, and he never purchased drugs on his own. The probation report stated defendant was unemployed.

The probation report included a letter from G., who stated the incident was her fault. There were also handwritten letters from defendant's daughters, C-1 and C-2, begging the court not to put their father in jail, that he was a good father, he had five children to watch over, they loved him, and it would be cruel to take him away from them.[FN7]

> FN7. While G. refused to testify at the guilt phase, she appeared at the sentencing hearing, requested to address the court, apologized for letting "this go on for as long as I have," and stated that the entire incident was her fault and defendant never touched the children. G. stated she was arguing with defendant, her daughter got between them, G. pulled C-1 away from them, and C-1 "tripped on a shoe and hit the corner of her eye." As the court imposed the sentence in this case, it noted that it had the chance to observe the demeanors of G. and the children during the trial, and after "watching these little girls, I believe these little girls were manipulated and made to feel guilty for what someone else had done."

*B. The post-trial motions.*

Defendant filed a request for the court to dismiss the prior strike conviction pursuant to section 1385 and *Romero,* and argued that his prior strike occurred "a long time ago" in 1993, he was placed on probation instead of being sentenced to prison, his performance on probation was good, and he did not suffer any subsequent felony convictions.

The prosecution filed opposition and argued his criminal record supported the imposition of a second strike term. The prosecution also submitted police reports about

the lengthy history of domestic disturbances between defendant and G. in 2005, 2006, and 2007. In March 2005, G. reported that defendant choked her and left with their children; defendant was on misdemeanor probation at the time. In October 2005, G. reported that defendant said she would be "'done'" if he caught her with another man. A few days later, G. called 911 and reported defendant had be aten her; defendant was arrested and cited.

In October, November, and December 2005, the parties reported mutual violations of a restraining order. In December 2005, G. reported defendant assaulted her while she was picking up the children; defendant was arrested and booked. In January 2006, G. reported that defendant threw her against the wall of his residence when she arrived to pick up her ten-year-old daughter. In June 2006, G. reported that defendant called and threatened to "'187,' meaning to kill" her new boyfriend; defendant was arrested and booked.

The prosecution argued that the court should not dismiss defendant's prior strike conviction because there were no mitigating circumstances in his prior record or the conduct underlying his current conviction, he repeatedly committed violent offenses and violated court orders, and he continued to "make choices favoring crime despite having had multiple opportunities to learn from his previous mistakes."

*C. The court's ruling*

At the sentencing hearing, defense counsel objected to the prosecution's reliance on instances where defendant was arrested but not charged with any offense. Counsel argued the prior strike should be dismissed because defendant only suffered two misdemeanor convictions after the 1993 prior strike conviction. Counsel acknowledged defendant was on misdemeanor probation when he committed the instant offense, but argued defendant "wasn't even aware he had a strike on his record."[FN8]

FN8. This argument is somewhat undermined by C-2's statement to Officer Cardenas, that defendant told G. not to call the police because "I'll go to jail for a long time."

The court denied defendant's request to dismiss the prior strike conviction, and expressly declined to consider defendant's lengthy history of arrests and dismissed charges.

"... [I]t is clear that [defendant] has over the years continual and sufficient continuing arrests and charges filed by the prosecutor, but I'm not considering those for this purpose. However, I do consider the strike offense. I do consider the fact that [defendant] was on misdemeanor probation at the time of this event and conviction. That he has unsatisfactorily participated in probation on the [violation of section] 422 [criminal threats] for which he was convicted on July 11th 2006. I do consider what appears to be a lack of any meaningful or any sufficiently significant change in his lifestyle appreciably. The Court does take into consideration the fact that he does have a trade, does have a skill. On balance, and weighing the competing interests of the right of the defendant in this-or the convicted person in this circumstance vs. the rights of the community under [section] 1385, as the Court understands it, the Court will deny the invitation to strike the prior felony conviction for purposes of sentencing in this case." The court denied probation and imposed the midterm of four years, doubled to eight years as the second strike term.

*D. Analysis.*

The "Three Strikes Law" "'does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can stand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme.'" [Citation.]" (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*).)

Section 1385 permits the trial court to exercise its discretion and dismiss a prior strike conviction in furtherance of justice. (§ 1385, subd. (a); *People v. Williams* (1998) 17 Cal.4th 148, 158-159 (*Williams*); *Romero, supra,* 13 Cal.4th at pp. 529-530 .) A defendant has no right to make a motion and the court has no obligation to make a ruling under section 1385, but the defendant may "'invite the court to exercise its power'" under the statute to dismiss the prior strike conviction. (*Carmony, supra,* 33 Cal.4th 367, 375.)

In exercising its discretion, the trial court "must consider whether, in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams, supra,* 17 Cal.4th at p. 161.)

The court's decision not to dismiss a prior strike conviction is subject to review under the deferential abuse of discretion standard, and will not be reversed absent a showing of clear abuse. (*Carmony, supra,* 33 Cal.4th at pp. 376-377.) In determining whether the trial court abused its discretion, "'[i]t is not enough to show that reasonable people might disagree about whether to strike one or more' prior conviction allegations. [Citation.]" (*Id.* at p. 378.)

"Because the circumstances must be 'extraordinary ... by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Ibid.*)

When the record shows the trial court considered relevant factors and acted to achieve legitimate sentencing objectives, the court's decision will not be disturbed on appeal. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

The trial court did not abuse its discretion when it denied defendant's request to dismiss his prior strike conviction in this case. Defendant makes much of the fact that he had only one prior felony conviction in 1993, he was placed on probation for that offense, and he did not commit additional felonies after that time. Such an argument ignores his convictions for assault with a deadly weapon, battery, criminal threats, and contempt of court, being ordered to attend treatment as a batterer, and his repeated violations of the restraining order to stay away from G. Defendant committed the instant offense while on probation, and he was at the residence with G. and the children in violation of the existing restraining order.

(See Resp't's Mot. Dismiss, Ex. 2.)

This claim is also premised on state law and not cognizable.  Petitioner claims the trial

court abused its discretion by failing to dismiss a strike prior in violation of California law.  The

California courts determined that the trial court properly applied state law principles.  This Court

is bound by the decision of the state courts on a question of state law.  Oxborrow, 877 F.2d at

1399.  Absent fundamental unfairness, federal habeas relief is unavailable for alleged error in the

interpretation or application of a state sentencing law. Miller v. Vasquez, 868 F.2d 1116, 1118-

19 (9th Cir.1989), citing Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.1985), cert. denied,

478 U.S. 1021(1986). No relief is available for this claim. See, e.g., Mamaril v. Swarthout, 2011

WL 2709290 (E.D.Cal.2011), citing Estelle, 502 U.S. at 67 ("petitioner's contention that the trial

court abused its discretion by not striking his prior strikes is an issue of state law that fails to

present a cognizable federal claim").

III.     Certificate of Appealability

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

district court's denial of his petition, and an appeal is only allowed in certain circumstances.

Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)     (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of

appealability "if jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El</u>, 537 U.S. at 327; <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." <u>Miller-El</u>, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**ORDER**

Accordingly, IT IS SO ORDERED:

1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

2) The Clerk of Court is DIRECTED to enter judgment; and

3) The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

**Dated:    July 31, 2012           /s/ Barbara A. McAuliffe**
UNITED STATES MAGISTRATE JUDGE

40